## THE STATE v. HOWELL, *Appellant.*

1. **Criminal Practice:** WHEN SUPREME COURT WILL REVIEW THE EVIDENCE. The supreme court will not reverse a judgment in a criminal case on the ground that the verdict is not supported by the evidence, unless there is a total failure of evidence or it is so weak that there is a necessary inference that the verdict is the result of passion, prejudice or partiality.

2. ————: EVIDENCE OF GOOD CHARACTER. Evidence of good character of the defendant is not restricted on a criminal trial to a case where his guilt is doubtful ; it is admissible to create such doubt and is always relevant.

3. ————: ALIBI: BURDEN OF SHOWING NOT ON DEFENDANT. The burden does not devolve on the defendant in a criminal case of establishing to the satisfaction of the jury an *alibi* relied on by him as a defense, and an instruction to that effect is erroneous. (*State v. Jennings*, 81 Mo. 185, *not followed.*)

4. ————: ————: REASONABLE DOUBT. Where the evidence on the question of an *alibi* raises a reasonable doubt as to defendant's guilt, he is entitled to the benefit of such doubt, and, therefore, to an acquittal.

*Appeal from Linn Circuit Court.*—Hon. G. D. Burgess, Judge.

Reversed and remanded.

*A. W. Mullins* for appellant.

(1) The third count of the indictment either charges that Nettie Hall killed and murdered Joseph A. Howell, the defendant, or else it is meaningless. It does not charge that the defendant killed Nettie Hall, and, therefore, the motion to quash that count should have been sustained by the court. *State v. Edwards*, 70 Mo. 480. (2) The fourth instruction given by the court for the state is a mere abstraction for the most part; incomplete in itself, and obviously calculated to mislead the jury. The state's sixth instruction is incorrect in limiting the weight and effect that the jury may, under the law, give to the evidence of the defendant testifying in his own behalf. The state's fifth instruction had already fully and properly directed the jury with respect to the defendant's own evidence. R. S. 1879, sec. 1918. The last clause in said sixth instruction is not authorized by that section of the statute. And the state's seventh instruction on the defense of *alibi*, raised by the evidence in the case, is not the law. *People v. Fong-Ah-Sing*, 64 Cal. 253; *State v. Kelly*, 16 Mo. App. 213; *State v. Lewis*, 69 Mo. 91; Wharton's Criminal Evidence [8 Ed.] sec. 333, and note 5. If the objection raised as to the alleged insufficiency of the third count of the indictment is well taken then the eleventh instruction given for the state is erroneous. The jury ought not to have been so instructed that they could find the defendant guilty on a count of the indictment that is bad. (3) The court erred in refusing to give defendant's instruction numbered 7 and in giving in lieu

thereof an instruction to the jury on the court's own motion. The court's instruction directed the jury that, if "the facts and circumstances proven and relied on to establish the defendant's guilt are in doubt," then the jury could consider the evidence as to the defendant's good character. This is not the law, but the contrary as asked in defendant's instruction, refused by the court, contains the true rule of the law. "Evidence of good character is always to be considered by the jury in making up their verdict as to the guilt or innocence of the accused, just like any other fact in the case, and no distinction is to be taken between evidence of fact and evidence of character. If all the other evidence taken by itself proves the prisoner guilty, the jury are not at liberty, for that reason, to fail to consider evidence of this character." The admissibility of this evidence has sometimes been restricted to doubtful cases, but in such cases the accused is entitled to an acquittal without regard to character, and evidence of good character is offered to make a doubtful case. *State v. McNally*, 87 Mo. 658–659; *State v. Alexander*, 66 Mo. 160–161; Wharton's Criminal Ev. [8 Ed.] secs. 66, 67; 3 Greenl. on Ev., sec. 25; 1 Bishop Cr. Proc., sec. 489. (4) The court should have given the defendant's eighth instruction. It was a case wherein such a cautionary instruction to the jury, as disclosed by the evidence of several witnesses and the affidavits of William Brassfield and John W. Warner, would have been eminently proper; and in the interest of justice and the right administration of the law it was demanded. *State v. Talbott*, 73 Mo. 347. And the court erred in refusing to give defendant's ninth instruction. That instruction would have directed the jury that, although they might find, from the evidence, that Nettie Hall was killed and murdered, yet, if, from the evidence, the jury entertained a reasonable doubt as to whether the defendant or some other person committed the crime, then the

defendant was entitled to an acquittal. This is the law.
3 Greenl. on Ev., sec. 30; Wharton's Cr. Ev. [8 Ed.] secs.
325, 330. The defendant's tenth instruction, on the ques-
tion of *alibi*, should have been given. It is a literal copy
of the instruction asked by the defendant in the case of
*State v. Lewis*, 69 Mo. 92, and in regard to it this court,
speaking by Judge NAPTON, said, "It was unquestion-
ably the law." 69 Mo. 94. (5) The court erred in
refusing to give the defendant's eleventh and twelfth
instructions. They present the correct rule of law as to
the degree of proof requisite in such case to establish
guilt and justify a conviction. And the direction to
the jury contained the said eleventh instruction that
"if there is any one material fact proved to the satis-
faction of the jury by a preponderance of the evidence
which is inconsistent with the defendant's guilt, that is
sufficient to raise a reasonable doubt," was pertinent to
the case and stated the law correctly. Nothing was
given in lieu of it. The defendant's fourth instruction
was correct as asked, and the insertion of the words,
"other reasonable," may have been prejudicial to the
defendant. *People v. Bennett*, 49 N. Y. 144. (6) Besides
the mistakes and errors, prejudicial to the defendant,
committed by the court and to which attention was
called in the motion for a new trial, which, I insist,
demanded the granting of the motion, the evidence as
disclosed by the entire record was insufficient to justify
or support the verdict. And for this reason the motion
should have been sustained and a new trial granted.
*State v. Mansfield*, 41 Mo. 470; *State v. Daubert*, 42
Mo. 242; *State v. Marshall*, 47 Mo. 378, 381; *State v.
Chouteau Hunt*, 91 Mo. 490; *State v. Castor*, 93 Mo.
242; *State v. Glahn*, 97 Mo. 678; *Whitsett v. Ransom*,
79 Mo. 258; *Spohn v. Railroad*, 87 Mo. 74.

*J. M. Wood*, Attorney General, and *C. C. Brigger*,
Prosecuting Attorney, for the State.

(1) Murder in the first degree is correctly defined in accordance with all the decisions. *State v. Brooks,* 92 Mo. 552; *State v. Gee,* 85 Mo. 647; *State v. Thomas,* 78 Mo. 327. (2) The burden of establishing the *alibi* was upon the defendant. *State v. Rowland,* 72 Iowa, 327; *State v. Jennings,* 81 Mo. 185; *Garrity v. People,* 107 Ill. 162; *State v. Freeman,* 100 N. C. 429. (3) There was no error committed by the court in refusing instruction number 7 asked by defendant, and in giving, of its own motion, the above instruction relative to character. While said instruction, which was given, is in its phraseology different from the approved instructions upon that subject, it submits a proposition of law which is well settled. If the facts and circumstances proven show the defendant to be guilty, then clearly evidence of his good character can be of no avail to him, but when this is not the case, and the defendant has established a good character, then it is proper for the jury to consider his good character in connection with all the facts and circumstances in determining his guilt or innocence. 1 Bishop Crim. Proc., sec. 1116; *State v. Ware,* 62 Mo. 251.

RAY, C. J.—In this case the defendant, Joseph A. Howell, was indicted for the murder of "Nettie Hall." The indictment contains three counts. The *first* charges that defendant shot and killed Nettie Hall, with a revolving pistol. The *second* charges, in substance, that defendant, with some heavy instrument or weapon, to the jurors unknown, did forcibly strike and beat the said Nettie Hall, crushing, fracturing and breaking her skull, giving her a mortal wound of which she instantly died. The *third* count, in effect, charges that defendant assaulted said Nettie Hall, in some way and manner, and by some means, instruments and weapons to the jurors unknown, and thereby did kill and murder the

said Nettie Hall. On this indictment the defendant was tried, found guilty of murder in the first degree, and sentenced accordingly, from which, after unsuccessful motions for new trial and arrest, he has appealed to this court.

The evidence offered by the state was entirely circumstantial. Defendant's counsel insists that the evidence disclosed by the entire record, is insufficient to justify or support the verdict. This question makes it necessary that a somewhat extended statement of the facts and circumstances in evidence should be made, and, to that end, such of them as are deemed material, will appear in the progress of this opinion.

Mrs. Minnie Hall, widow of Ansel Hall, and her four children, the eldest about ten and the youngest about three years old, resided on a small farm about five miles southwest of Brookfield, Linn county, Missouri. "Nettie Hall," with whose murder defendant stands charged, was one of the four children, then about five years old. Joseph A. Howell, the defendant, was a first cousin of Mrs. Hall, about twenty-four years old, and came to that neighborhood from Ohio, where he was raised, in March, 1887, some eighteen or twenty months before this tragedy, stopping for a few days first at Sumner, Chariton county, Missouri, with his aunt, Mrs. Brooks, the mother of Mrs. Hall; from there he came to Ansel Hall's, then living, where he remained a week, and from there he went to Mr. James Hall's, the father-in-law of Mrs. Hall, about one-half mile distant on the west, where he remained that spring and summer, working as a farm hand; and from there he went to Newkirk's, a neighbor, where he continued as a farm hand until he commenced teaching school at "Prairie Mound," about five miles southwest from Mrs. Hall's, and was so engaged up to the night of the alleged murder.

In the afternoon of January 19, 1889, the defendant went on foot from his boarding house in his school district to Brookfield, where he arrived about dark, or half after five o'clock. While *en route* to Brookfield that afternoon about four o'clock, he passed by and stopped at Mrs. Hall's for a short time—from six to ten minutes, and obtained some articles of clothing from a trunk of his that had been left there, containing some books, summer clothing and other articles. Mrs. Hall, it seems, had been doing his washing while living in that vicinity, and this trunk had been left at her house in the meantime.

After leaving Mrs. Hall's the defendant was met by Mr. James Hall in the road near his house, going north on foot towards Brookfield. The snow had then commenced falling and with brief intervals continued to fall that afternoon, during the early part of the night and up to midnight, and got to be three or four inches deep. At about half after ten o'clock that night, a neighbor residing about a half mile distant on the west, discovered Mrs. Hall's house, a one-story frame building, to be on fire and enveloped with flames. Two men went immediately from this neighbor's to the burning building. They went around the house but did not then discover any persons within. It was all ablaze, and, in the language of the witness, presented "one big round of flame," so that nothing within could be seen. Other parties soon came, when it was discovered that there were lifeless persons in the midst of the flames, supposed to be Mrs. Hall and her children. R. N. Vorce, describing the persons thus seen in the midst of the flames, their position and appearance, in substance says: He saw Mrs. Hall close up to that side of the house. * * * The bed was partly burned down and the bedding was on the floor. Right there I saw Mrs. Minnie Hall; her clothes were on but they were charred. * * * She was down on her knee, near the bed, in this

position, with her head thrown back. That he and Smith got a ten-foot pole and a clothes line and threw it around her and tried to get her out, but could not. While we were thus engaged, the floor gave way and these parties went down in the cellar.

The little girl, "Nettie Hall," it seems, when the floor gave way, went down right at the cellar door, and Vorce and Smith, with the aid of a rod about sixteen feet long with a crook on the end, succeeded in rescuing her body from the burning building. The remains of the other bodies, it seems, were not taken from the ruins until some time the next day. They were burnt beyond recognition, but from the circumstances as before stated were believed to be those of Mrs. Hall and her children. Before proceeding, however, with what appeared on a careful examination of these remains as well as the cellar under the house, the day after the fire, it is proper to state what else transpired on the night of the fire and immediately following the burning of the house and its occupants.

Shortly after the neighbors reached the burning building the track of some person was discovered near the house and between it and a pile of hay or straw near by and along this track straw was scattered as if dropt in being carried to the house, where it appears to have been used in igniting and burning the building and its occupants. This track started south a short distance where it turned and went north, in the direction of Brookfield. Four young men, Lisher, Scouton, Smith and Hall, were deputed to follow the track, see where it led, and if possible detect and arrest the party making it. About midnight they started in pursuit and followed its meandering course, regardless of roads, through enclosures, brush, timber and prairie until it reached the railroad, west of Brookfield, thence down the railroad to the trestle across Elk creek, where it left the railroad, crossed the fence and went up (southeast

it seems) into the city by the "Clark Hotel" and further east and north where it was lost somewhere about sixty yards south of the railroad as will further appear hereafter.

It may here be remarked that the pursuing party, in following this winding track, traveled about seven miles and was about two hours on the way; that there was no break in the track they followed; that no other track connected with, crossed or intercepted it in any way; that no track was seen coming from any direction to, or in the direction of, Mrs. Hall's, nor was any seen by the pursuing party while *en route*, coming from the direction of Brookfield, or going towards Mrs. Hall's. At the trestle over "Elk creek," the pursuing party divided, two of their number, Smith and Hall, followed the railroad to the depot to enquire about the trains, notify the railroad officials and others what had occurred and request their co-operation in discovering and capturing the party in question. The other two, Scouton and Lisher, followed the track where it left the railroad, up to the "Clark Hotel," where they halted; one of them, Lisher, remaining while Scouton went in search of the city marshal, to secure his services in their further pursuit, in the city limits.

Just here we may remark, that the witnesses speaking of their pursuit of the track or tracks, and of the party or parties making them, testify with reference to *maps* before them, but these maps are not copied in the record and it is therefore difficult, if not impossible, to correctly understand them, or gather any intelligible idea of the localities, courses and distance referred to in their testimony. But, proceeding as best we can, we will endeavor to state what transpired in this connection after the return of Scouton with Critchfield, the city marshal, which was at 2:30 in the morning. These parties, Scouton and Lisher and the marshal, took the track where it passed the "Clark Hotel" and followed

it further east and then north, where they lost it; just how far, or where, it is impossible to say, except that it appears to have been somewhere about sixty yards south of the Hannibal and St. Joe railroad. After they lost it they went up north it seems to the "switch yards," where they found and joined some parties, railroad officials, switchmen and others, in the pursuit of some person, who had just entered and was dodging about, among and upon some standing and moving freight cars, and trying to make his escape from his pursuers, in which, for the time being at least, he seemed to have succeeded. Some of these pursuing parties, it appears, were following him by his tracks, and others chasing him by sight, at least for a time.

In his flight the party chased, it seems, went west through the switch yards, climbed over a high fence into a lumber yard and wood yard and, coming out on Main street, crossed the railroad and went up north, on a run by the "Q Hotel" (where his pursuers lost sight of him) and then up to Snow's corner and on to the Baptist church, three blocks north of railroad; then west one block to Catholic church; then south two blocks where he turned around the corner and went along to the "Babb Hotel" and clear on west to the railroad track; there is a fence here; he doubled right around in the same track until he came to the "Babb Hotel," right there was a step-off; he made a break for a little alley that comes in here between the fence and the hotel. "We followed the track in there, where we lost it. We tracked around and came up the street to the hotel. We turned around there, and asked the porter," and it seems they ascertained that some one, shortly before that, had stopped at the hotel, called for a room and was shown up to bed in room number 11, where upon the doors being opened, upon the demand of the city marshal and his associates, the defendant was found and arrested, about three o'clock in the morning. When the

defendant opened the door he was found undressed, having on his night clothes. The marshal told him to consider himself under arrest. The defendant said, "What does this mean?" "I said there has been a house and a woman and four children burned, and the track has been followed in the snow to this house and to this room, and I don't see any one but you." He said: 'I have not been to the country to-night.' I said: 'How do you know the house was burned in the country, it might have been in town.' He made no reply."

Among the clothing and apparel found in defendant's room, there was a light grey overcoat, a round, black fur cap and a pair of overshoes. Being asked as to the condition of his clothing, cap and overshoes, etc., the marshal said: "His pantaloons were wet; they were drabbled up to the knee and his overcoat was wet, and there was a kind of layer of snow upon the cap that had not melted." In searching his clothing, the marshal found a pistol (thirty-eight calibre) and some matches, part of a box and one box that had not been opened; he also found what he called a "link," a link of a chain, wrapped, but large enough to get your hand in it.

Critchfield, being asked to state condition of revolver at the time he took it, said: "I took the pistol, and a short time after I was looking at it there was four of the chambers empty and looked smoked; looked like they had been fresh fired; one chamber looked rusty. I, also, found a cartridge in his pocket."

It appears by the time the pursuing party from the burnt building reached Brookfield, the clouds had partially passed away, and the moon shining through a hazy mist made it quite light; on the streets of the city, in the switch-yards and elsewhere lamps were burning at convenient distances, and contributed to render objects and persons quite visible. Among the railroad and city officials and others who were present and saw

the person that was chased that night through the switch yards, along the streets and elsewhere in the city, there were a number who, in describing his general appearance and apparel as he passed along, said that he had on a "light grey overcoat and round, black fur cap." On cross-examination they generally admitted that that class of overcoats and caps were in common use that winter, and worn by many persons in and about that city and elsewhere. A number of these parties saw the defendant that night after he was arrested and next morning and claim on oath to recognize and identify him as the person they had seen and chased through the streets and elsewhere, as hereinbefore stated. Others who also saw him, and had equal opportunities, failed to recognize or identify him as such.

The party who made the track, that was followed from Mrs. Hall's earlier in the night to Brookfield, and on past the Clark Hotel, and further east and north to where it was lost, somewhere about sixty yards south of the railroad, was not seen by any person *while* passing from Mrs. Hall's to the point where his track was lost, as above stated, unless it was by the witness, Wm. Curtis. This witness, who was "night policeman," and resided in the southwest part of the city, across the railroad, says in substance, that he started home that night from the "Q. Hotel" at ten minutes to two o'clock; that he went straight down Main street; that in going down, he passed what is known as "Lenhart Gallery;" that as he was going right along here, going south, he stood in ten feet almost of the corner of the block, running east, when some person passed right in front of him, in ten feet of him; that the moon came out and it was pretty light. On the corner there was a street lamp that made it lighter. Being asked how he was dressed, said, in effect, that he wore a light grey overcoat and black fur cap; that he noticed some one coming along and walking pretty fast, and

went right ahead of me; "I noticed it was a man I saw in the early part of the evening. I did not know what his name was. Just as I passed, I stopped on the corner to see where he went to; I wanted to see whether he went to the Clark house, after he went past, I paid no more attention to him, I passed on."

This witness saw the defendant the morning after he was arrested, and, on oath, says he recognizes him as the same person he saw the night before pass in front of him, near the Clark house, as he went home that night. On cross-examination, being asked if there was any difference between defendant's black fur cap, and those that were frequently worn last winter, said : "I do not know that there was." Being also asked if. he discovered any difference between that and the one Critchfield wore, said : "No, sir, I do not know that I do." Similar questions and answers as to the overcoat were made and given. It was also in evidence that the track followed from Mrs. Hall's to Brookfield, as well as that followed through the switch yards and streets of that city was made by an overshoe, or overshoes, and that, on being measured, the first was found to be eleven inches long, and the second eleven and a half; that overshoes were ordinarily one size larger than the shoe it covered; that defendant's shoe worn the night of his arrest was number four and a half, and that of the shoe worn at the trial was number five, while the overshoe produced at the trial, and claimed by the state to be the same found in his room on the night of his arrest, appeared on trial to be much too large for defendant's foot. It also appeared in evidence that Critchfield, the day after defendant was taken to Linneus jail, got from the jailer what he supposed to be the same overshoes found in defendant's room when arrested, and applied them to the tracks in the snow made by the party chased through the switch yards and found it to fit exactly.

It also appears in evidence by the testimony of "Esquire George Anderson," who held the inquest, that he was shown the tracks of the overshoe leading from Mrs. Hall's to Brookfield by R. N. Vorce the morning after the fire and looked at it, and, being asked what was the number of his boot or shoe, said it was a "number nine," and, being requested to state the size of the track as compared with his foot, said: "It was an overshoe that made the track and the overshoe was larger than his boot; do not know that it was larger than his overshoe. "And, being further asked if it was a bigger track than number nine, said: "I should think so; that is my opinion."

Henry Smith, a witness for the state, testified that he made the acquaintance of defendant in St. Louis in the fall of 1886 ; that he and defendant and Andy Miller, a German boy, since deceased, traveled together from St. Louis to Memphis, Tennessee, from there to Mississippi and back again to Memphis and from there to Kansas City, Missouri, and from there to the neighborhood of Mrs. Hall's, Linn county, Missouri, where they arrived in March, 1887, and that ever since he had resided at Mr. Vorce's, in less than one-half mile of Mrs. Hall's and was well acquainted with her. The evidence of this witness is important, and in connection with his cross-examination extended, but necessary perhaps in estimating its value. Among other things he undertakes to detail a conversation alleged to have been held with the defendant in reference to his relation with Mrs. Hall, and also a conversation between Mrs. Hall and defendant, alleged to have been overheard, in reference thereto, as well as what defendant had done and proposed to do, as well also, as what he said Mrs. Hall herself had done in that connection, together with what he desired the witness to do in that behalf ; what the witness himself afterwards did and said in that

connection, or in reference to a kindred affair of his own, also appeared on his cross-examination.

The following is the substance of his evidence in that behalf, he said:   " Some three or four weeks before Mrs. Hall's house was burnt, on Sunday morning, I went with Mr. Howell over to Minnie Hall's ; he insisted on my going ; said there was some talk about him and Mrs. Hall, and he did not want to go there alone ; we got there about ten o'clock in the morning ; got dinner and left about three or four in the evening.   After dinner overheard a conversation between Howell and Mrs. Hall. "

*Q.*   " Tell the jury what conversation passed between them. "   *A.*   " I heard Mrs. Hall say :   'Joe, I will tell Mr. Hall. '   *Q.*   " What reply, did he make ?"   *A.*   " Joe said :   'tell him and be damned. ' "   *Q.* " What further passed between them, if you overheard anything, if you remember it ?"   *A.*   " I heard Mrs. Hall say :   ' there was never anybody else but Ansel ever meddled with me, except you.'   Joe says :   'yes, there has, Minnie, there is other parties running after you. ' "

Witness and Howell left Mrs. Hall's about three or four o'clock and on the way had further conversation, as follows :

*Q.*   " Did you have any conversation with defendant ?"

*A.*   " Yes, sir, we had a little conversation. "

*Q.*   " State to the jury what that conversation was. "

*A.*   " He said : ' Henry, I am in lots of trouble.   I would rather be a married man to-day than be in my shoes. ' He was a little backward. I asked him why. He says : ' Mrs. Hall is in the family way, and she lays it to me;' he said 'if she was a nice woman I would marry her ;' but he says, 'I think *there are other parties running there.*' He says that child has to be got rid of.   He said : ' I have already paid out a good deal of money to get shut of the child, and also to the Ancient Order of United

Workmen to build up a reputation, and I do not propose to have it broke down.' I said, the best thing you can do, is to teach your school out and leave here."

Q. "What reply did he make?" A. "He said first, he would leave, then he said, that damn young one has got to be rid of."

Q. "What other conversation did you have?" A. "He says: 'she has been going to old Dr. Scott's but I do not believe Dr. Scott is giving her a damn thing to do her any good.' He said, 'you are better acquainted with Dr. Scott than I am; go over and get her something.' I said, he will not give me anything any quicker than he would you. I said we are friends, and I would like to do anything for you I can, but the best thing you can do, is to leave. Joe studied a little while and then said: 'No, damn if I like to have my character broke down; we come here to make a reputation and we will stay.'"

Q. "Is that all that passed between you and him on that occasion?" A. "*He spoke something about Dr. Spurgeon.* I had been sick a short time before that and he waited on me. He said: 'Maybe Spurgeon will give you something.' He wanted me to go and see Spurgeon for him; I said it is a criminal offense for a doctor to get rid of a child." Q. "What reply did he make?" A. "He said he did not care a damn, that the young one had to be got rid of."

Q. "State whether or not you agreed to get any medicine for him." A. "No, sir. I told him I would do all I could for him; that we were friends and had been for some time; that the best thing for you to do is to leave. I said if you have not got money enough after your school is out, I will let you have money."

ON CROSS-EXAMINATION.

Q. "And you did tell Mr. Howell of the *criminality* of this thing you have been telling." A. "Yes, sir, I did."

*Q.* "And yet you commenced talking to Dr. Spurgeon about this very matter; about the situation of the woman?" *A.* "I spoke something about it; never named any one's name."

*Q.* "That it was getting time that something had to be done, and that damn quick? And you talked in that manner until Dr. Spurgeon drove you from his office?" *A.* "No, sir."

*Q.* "And you were talking for yourself in the matter and for no one else; ain't that the fact?" *A.* "I was not."

*Q.* "You never mentioned Mr. Howell?" *A.* "I never spoke for Mr. Howell or nobody else; there were no names mentioned." * * *

*Q.* "Said nothing in regard to that lady?" *A.* "I said nothing in regard to that lady whatever."

*Q.* "Never mentioned her name?" *A.* "No, sir."

*Q.* "When you were at Dr. Spurgeon's you were not talking anything about her condition?" *A.* "Nothing about Mrs. Minnie Hall." * * *

*Q.* "How long before that was it you were up to Laclede to see Dr. Spurgeon?" *A.* "I do not know that I am able to say. I did not go up a purpose to see him; he said to come up; he did not like to treat his patients before he saw them, and I went up one night to see Dr. Spurgeon and get a little medicine."

*Q.* "Do you know what day of the week it was?" *A.* "No, sir, I do not."

*Q.* "You recollect if it was not about two weeks before this difficulty—before the death of this woman and her children?" *A.* "I do not know."

*Q.* "How long do you think it was?" *A.* "I do not know; that is a question I cannot answer. I do not know."

*Q.* "Can you approximate it in any way?" *A.* "It might have been two or three weeks. I cannot say, for I do not know."

The State v. Howell.

*Q.* "Might have been two or three weeks, is that your opinion about it?" *A.* "I do not know how long it was."

*Q.* "You know whether it was a month or not?" *A.* "I do not know whether it was a month. I do not know what time it was if I do not know."

*Q.* "You mean to say you do not care to answer that question?" *A.* "I mean to say, I cannot answer it correctly, if I do not know."

It may here be added that the evidence of this witness, on cross-examination, in reference to the *history* and *ownership* of the "link," or "link of a logchain," mentioned in the record, is, upon the whole, contradictory, evasive and unsatisfactory.

Returning, now, to the house of Mrs. Hall and the discoveries there made, the day after the fire, upon an examination of the remains taken from the ruins, and also upon an examination of the cellar under the house, and the door leading into the same, it appeared that the skull of Mrs. Hall and her daughter Nettie had been broken, knocked off on top, cut or split open. James Hall, speaking of Nettie, said: "The skull seemed to be as if the front part of it was knocked off or split open. The brain was all exposed." R. N. Vorce, speaking of Mrs. Hall, said: "Her skull was all burnt bare, and was as white as snow. I could see the veins; but in the skull, right through here, looked as if it was cut right in with a hatchet." And, in speaking of Nettie Hall, this witness said: "Her skull was burned so that there was nothing but the skull bone; the skull was white here; there was a piece of skull bone cut right off, looked like it was done with an axe, or some sharp instrument; there was a piece of scalp that did not go off with the bone, and that fell back; it was turned back, so there was a part that was not burned."

Ranchan, foreman of the inquest, speaking of Nettie Hall, said: "On examination of the skull, we found

that there was a crack, seemed to go across and above the eye. * * * The right part of the skull was gone, the top that remained under the hair; I raised the scalp off and looked at her brain, it was hard, and I looked to see whether there was a *bullet hole;* it was cooked so you could not tell much about it. * * * I raised the scalp up part of the way; I suppose it was about two inches long, raising the scalp up off of the brain I could see a crack along the skull; the skull was broken where the fire had not touched it."

R. N. Vorce, speaking of the nature of the injury to the skull of Mrs. Hall, said: "It looked as if it was cut right in with a hatchet." And, referring to the condition of Nettie Hall, said: "Here on her head there was a piece of skull bone cut right off; looked like it was done with the axe, or some sharp instrument." In this connection, this witness further said: "I wanted to see if I could find the hatchet; I knew the hatchet was there, and I wanted to see if I could find it; we hunted around for the hatchet." This witness, in describing the appearance of Mrs. Hall and Nettie, said: "These persons were still dressed; they had their wearing apparel on."

On examination of the cellar under the burnt house, *the day after the fire,* there was also discovered, buried in the bottom of the cellar, what proved to be, on examination of the doctors present, a human "*fetus,*" about six or seven months old. This fetus, it seemed, had been so covered up with dry dirt and ashes that the fire seemed to have made but little impression on it, except that it appeared a little shriveled, but bore no marks of injury to the fetus itself. The body of the fetus was in a perfect state, that is, no part of it was gone. The doctors were all clearly of opinion that an abortion had been produced. They were equally confident that the fetus had been separated from the body of its supposed mother and buried in the cellar where found before the house was burnt.

Brott said : "Up here in the northeast corner of the cellar there were some broken pieces of a chamber; it was broken to pieces there. *Q.* "How far from where fetus was found?" *A.* "As much as five or six feet; never measured it." Being asked how the house was situated and how many rooms, said: "Two front rooms, and back of them a shed room, called a shed kitchen."

Durr said: "I was digging in the ashes, saw something roll out, and it looked curious. The doctors called it a 'fetus;' it was found near the center of the building. Being asked what was over it, said: "Some ashes and dry dirt; it appeared like it was covered over with dry dirt; there were bricks scattered all around, too." *Q.* "Dry dirt heaped over it, buried down in that?" *A.* "It looked that way."

It also appeared that there was no communication with the cellar from the interior of the dwelling. The only entrance being a door, opening on the outside. This door, it seems, had been off and left open all summer and the cellar used as a play house by the children; but in the fall or early part of the winter, the door had been put on and securely fastened with hinges and nailed up. This cellar door, when the neighbors arrived at the burning house, was found to have been freshly torn or broken off from the house, and was lying on the ground, some six or eight feet from the building, and when lifted up *snow* was found on the ground *under* it.

Four doctors were examined as to the shortest period in which an abortion could ordinarily be produced. All but one agreed that if medicine were used six to eight hours was the shortest time. One thought it could be done in one or two hours. All agreed that no abortion could be produced without danger to the mother; but that, when necessary to save the life of the mother, it might, in the hands of skilled physicians, be resorted to with comparative safety to the mother. One

of the doctors said: "Ladies sometimes attempt to bring about that condition and succeed."

At the close of the evidence for the state, the defendant offered himself as a witness in his own behalf. So much of his testimony pertaining to his own personal history, travels, whereabouts and employments from the time of his arrival in the city of St. Louis in October, 1886, to that of his arrival at Brookfield at half after five o'clock on the evening of January 19, 1889, sufficiently appears by what has already been stated in that behalf in the early part of this opinion, and need not again be restated. That much is conceded, or, at least, not controverted. His statement of what transpired with him from that time to about eight o'clock that night is, also, practically conceded, or not controverted. The controverted question is, where he was, and what he was doing from that hour to the time of his arrest at the "Babb Hotel" at three o'clock that night. The theory of the prosecution on that question, gathered from the record, as we understand it, is, that the defendant, after or about that hour, left Brookfield on foot, and returned to Mrs. Hall's, a distance of some five miles—produced an abortion upon her; buried the fetus in the cellar, after which her death resulted from the operation, whereupon the defendant became frightened, and to conceal and destroy all evidence of the crime, and his presence and agency therein, deliberately murdered all the children by splitting and crushing their skulls with a hatchet, or some other sharp and heavy instrument, and also inflicting similar wounds in and upon the skull of the dead or dying mother. *Such*, at least, the evidence tends to prove the *mode and manner* of their death to have been, if it proves anything. After which their theory also is, that for the purposes of further covering up and concealing the crime and murder, he set fire to the house and burnt it up, with their remains therein; and then, in his fright,

fled back to Brookfield, making the indirect and mean-
dering track in the snow, which was followed by the
four young men to and into the city, and, as they
allege, through its streets as before described, leading
ultimately to the "Babb Hotel," where the defendant
was found and arrested by Marshal Critchfield, and
others, as before set out at three o'clock that night.

On the contrary, the theory of the defense in this
regard, as we gather from the record, is, that the defend-
ant was not out of the city of Brookfield that night,
after his arrival at about half after five o'clock that
evening, as before stated; that at no time after his said
arrival was he *south* of the Hannibal and St. Joseph
railroad in said city; that from the time of his said
arrival he was engaged in the transaction of various
business matters with the merchants, hardware and
jewelry men, and other parties of that city up to about
eight o'clock; that during that time he also got his
supper at Lapierre's restaurant on Main street, north of
the "Q. Hotel;" went to a barber shop and was shaved
and had his hair cut; bought some paper, two boxes
of matches and a bell for his schoolhouse at Prairie
Mound, paying five dollars on the bell; got a cuff button
(Almrolt was fixing for him) and during that time also
was in the various business houses mentioned, and
saw and talked with the proprietors and clerks thereof,
as well as various other parties and acquaintances he
met and conversed with during the time he was so
engaged. That he was so engaged during that period
is fully established by the testimony of the various
parties with whom said transactions were had. That
much is conceded, or at least not controverted. Indeed,
the defense claims that he was so engaged to a much
later period. But that is a controverted question.

The further theory of the defense on that point is,
that it was the expressed purpose of the defendant to
return direct to "Prairie Mound" that night, after

completing his business transactions if he could meet with some conveyance or opportunity of riding, if not, it was his intention to go by rail to Laclede, on a freight train going in that direction, as he was informed, at eleven and two o'clock that night, and from there on foot to Prairie Mound, the distance from Laclede being a mile and a half shorter than from Brookfield; that, finding no opportunity of riding to Prairie Mound, as he desired, defendant concluded to wait for the eleven or two o'clock train and go by rail to Laclede, and that while so waiting he employed his time in walking about the streets of the city in various directions, mostly in the northern part, and from there to the depot where he hoped to meet and board a train for Laclede; but these trains, failing to arrive, and seeing no chance to leave town that night, the defendant went to the "Babb Hotel," registered his name, called for a room, undressed and went to bed, about half after two o'clock; that after he had been there some thirty or thirty-five minutes the marshal and his crowd came and arrested him. The defendant, so far as his own testimony is concerned, in direct and express terms, supports both these theories of the defense in every particular. In equally explicit terms he denies every fact and allegation imputed to him, in the said theory of the prosecution. So far as defendant's alleged purpose of returning by rail to Laclede on his way home, mentioned in the second theory of the defense, is concerned, it finds support in the testimony of two witnesses.

Hiram Dooey, a resident of Brookfield, and an acquaintance of defendant, testifies that he met defendant in Dagget's hardware store, where the bell for schoolhouse was bought, about twenty-five to thirty minutes to eight o'clock, and had some conversation with him. On cross-examination this witness was asked, "whether or not, he invited Mr. Howell home with him that night," and, in reply, the witness said, "I did."

Being further asked what he said, his answer was, "He said no, he had to go back to 'Prairie Mound.'" On re-direct examination the witness was asked, "whether he (defendant) spoke of going over to Laclede that night." His answer, was: "He said if he could not get a chance to ride, he was going up on the train to Laclede, so he would not have so far to walk." On re-cross-examination witness being asked, "What is the distance from 'Prairie Mound' schoolhouse to Laclede," said: "Nine miles, probably a little more; they call it nine miles." Being further asked, "what is it to Brookfield?" said "ten." Being further asked: *Q.* "Between nine and ten to Laclede and ten to Brookfield?" *A.* "Yes, sir."

James Ballews, witness, said he was acquainted with defendant; saw him that night at Lapierre's restaurant between seven and eight o'clock eating lunch; after supper he spoke to Mr. Howell and asked him to come and go to the lecture. He, Howell, said he could not, did not have time. Said he wanted to go to Laclede; he wanted to know what train he could go on. Witness further said: "I told him he had better come and go to the lecture. He said, no, he could not; said maybe there was a train going over, extra; that he could slip a ride."

As to the alleged disposition which defendant claims to have made of himself after the close of his business transactions at about eight o'clock (as the evidence tends to show), and up to the time of his arrest at three o'clock, is a question which, so far as any direct evidence is concerned, depends largely upon his own individual testimony. True, one witness testifies to having seen and conversed with him at several places as late as nine and ten o'clock, but this witness is impeached to such an extent as to greatly damage his evidence. Brewer, another witness, said he saw Howell that night at the restaurant about eight o'clock, saw

him some other time, would not be positive when. "I was at the lecture that night, can't be positive whether it was before or after; saw him in main part of the town, but can't recollect where or when. I have some recollection of seeing 'Joe' some other time but can't recollect where or when it was, or whether before or after the lecture. The lecture commenced after eight, and continued about an hour and a half; can't say whether I saw Howell there or not; one of the boys spoke to him about going to the lecture; he said he could not then, perhaps he would be up after a while; have some recollection of seeing him some other place than at the restaurant, either before or afterwards."

Defendant in his testimony mentions seeing some parties coming out of or from the lecture room, after its close, whom he knew, and who are shown to have been there that night, but had no conversation with them. These parties, however, do not remember seeing him.

It may be conceded as claimed by the defense, that it is not unusual for parties, while waiting for an expected train to while away the time in loitering about the streets and depot of a village or station; but the prosecution says it was at least unfortunate for defendant, that he failed to meet or see some other friends or acquaintances, who remember it. This, however, may not have been impossible. Nor is it strange or improbable the defense insists, that, if the expected train should for any reason fail to arrive, the defendant should then go to a hotel and retire for the night. It may be mentioned in this connection, as the record shows, that defendant, before retiring, registered his own proper name as is usual on the hotel register. Nor is it surprising as the defense claims that there should have been some snow upon his cap and overcoat, if he spent the time from eight o'clock to two or half after, as he claims, since it is in evidence that the snow was falling more or less that night, until about

midnight, or afterwards.    But that, it is insisted on the other hand, would not account for the alleged "drabbled" condition of his pantaloons from the knee down; and might, they say, be explained upon the theory of his having made the track passing through underbrush, covered with the falling snow, on the route from Mrs. Hall's to Brookfield.    The evidence, however, tends to show that the snow only was from three to four inches deep; was damp and wet, and but little, if any, drifted.

His possession of the pistol and link when arrested, in view of the facts in evidence, has but little, if any, significance it is claimed since the condition of the skull of Mrs. Hall and Nettie and the nature of the wounds and injuries thereto tends to show that they were produced by some sharp as well as *heavy* instrument or weapon, such as the hatchet or axe or the like.    The character and nature of these wounds and injuries, it is claimed, negative the use of the pistol or link, in murdering the family.    There were no stains of blood or anything in the appearance of either to indicate that they had been used to break or crush the skulls, and, if so, that would not account for the *apparent* use of the hatchet or axe, in *splitting* the skulls, as testified by the witnesses.    Indeed, Critchfield's testimony to the effect that four chambers of the pistol were empty and looked smoked, as if freshly fired, if true, tends to show they were not so used.    The evidence as to the nature of the injuries, as well as the direct testimony of the defendant, which, to some extent, is corroborated by the evidence of Graham, and the Griffith children concerning the pistol, it is claimed, also tends to show that Critchfield was mistaken in his theory of their having been so used.    The defense claim, that the value and reliability of the evidence as to the color of the cap and overcoat, worn by the party chased through the railroad switch yards and streets of the city, casually seen and observed as he fled, by the aid of street lamps and

the dim light of a partially obscured moon, is much impaired by the fact, that such caps and overcoats were proven to have been in common use by many persons that winter at that place. No body, except the boy, Owen McKinney, claims to have been near enough to observe his features, or to have looked him square in the face, while he was thus fleeing and chased. This witness, it is true, says that he "was in two feet of him and held up his lantern and saw his face." The value of his evidence, it is also claimed, is much impaired by his cross-examination. He said in substance, that he never saw defendant before, to know him; that when he first saw him he had his head down, and when he put his lantern up, he pulled his cap down, that he did not know whether he was shaved or not, or whether he was wearing whiskers or mustache; said: "All he saw was along here" (indicating chin). This question was then asked:

*Q.* "Did you see his upper lip?" *A.* "I never noticed whether there was any mustache or not."

*Q.* "You do not know whether he was wearing whiskers, or clean shave, because he was covered up down to the chin?" *A.* "He had his hat down."

*Q.* "You could only see his chin?" *A.* "Yes, sir." *Q.* "You know him just by seeing his chin?" *A.* "Yes, sir."

It might be assumed by the jury, if they saw proper, as the evidence now before us tends to show that the party who made the track in the snow, leading from Mrs. Hall's to Brookfield, whoever he was, must have been the murderer. When, or how, he got to Mrs. Hall's does not certainly appear. It may be conceded, also, that there is no *direct* evidence whatever, that the defendant *left* Brookfield at or about eight o'clock that night, as claimed; or that he even went in the direction of Mrs. Hall's, within the city limits, unless it be found in the testimony of Charles French, whose evidence is to

the following effect, to-wit : That as he was going to the post office that night to get the mail of the Cyclone train from the east due at that point at fifteen minutes to eight o'clock he met some one by the pole at east end of passenger platform, that had the large lamp on it, who spoke to him, saying : 'good evening;' that looking up he saw it was the defendant, and said : "Good evening, Joe;" that he (defendant) was going across the track, going right along south; that he (witness) heard the train whistle and looking up the track saw the light; that the train was due fifteen minutes to eight; that he supposed it was on time; didn't know whether it was or not.

For the defense it is insisted that if defendant returned to Mrs. Hall's, as claimed by the prosecution, he must have left his track in the snow ; that the evidence negatives the existence of any such track, either at or about Mrs. Hall's, or anywhere on the route between her house and Brookfield ; that the snow falling after the supposed return track was made could not, by filling up, have completely obliterated *all trace* of its existence ; and that no trace of it, whatever, was seen by anyone. And it is further insisted by the defense that the perpetrator of the crime, whoever he was, must necessarily have arrived at Mrs. Hall's at a much earlier period that evening, and remained there long enough to produce the abortion, bury the fetus, murder the family and set fire to the house with the remains therein, and then leave before the same was discovered.

The most important evidence bearing on this whole question (in connection with the finding of the fetus and the opinion of medical experts) is that of the witness, Henry Smith, the substance of which is heretofore set out at length. It is the only testimony that furnishes a motive to any given party to commit such a crime, and that points directly to the defendant.

From the evidence it seems that it must be assumed that Mrs. Hall had borne improper relations with some one ; that an abortion had been produced that night, the cellar door violently torn from its fastening and deposited on the snow near by ; and that the fetus had been separated from its mother and buried in the cellar *before* the house was fired and burnt. The improbability of all this having been accomplished by defendant within the brief period necessarily intervening between his alleged departure from Brookfield and his supposed arrival at Mrs. Hall's is urged in defendant's behalf. To this, as far as it goes, the prosecution suggests that if medicine was used, and defendant had a motive to produce that result, he had time and opportunity by giving her the medicine at four o'clock that evening, when he stopped at her house on his way to Brookfield that afternoon. All this, however, as well as the rest of the testimony, was a question for the jury. The manifest difference in the size and number of defendant's foot and overshoe with that found and traced in the snow is also urged in defendant's behalf, and, seemingly, not without reason, but this also was for the jury.

The alleged conversation narrated by Smith in his testimony as having occurred at the house of Mrs. Hall, and after leaving there some three weeks before the murder, furnished important evidence in the cause and, if true, damaging to the defendant. Its value and credibility, however, was for the jury. No witnesses were offered to impeach him directly and, unless its value and credibility are impaired and discredited by his own cross-examination, his conduct and demeanor on the witness stand together with his relations to and with the defendant, Mrs. Hall and his medical advisers, as well as other matters in evidence, his evidence must be accepted and treated as unimpeached. But all this was matter for the jury.

It may be remarked, in passing, that neither Drs. Scott nor Spurgeon, whose names appear in Smith's

alleged narrative of what was said and took place between witness and defendant on the occasion referred to, for some reason has been called by the prosecution or defense to sustain or discredit the witness Smith.

The defendant, in reply to Smith's narrative of what was said and occurred at Mrs. Hall's, testifies in express and direct terms to the effect that no such conversation or incident was had or occurred; that the whole and every part of it is false from beginning to end; that he made no such statements to Smith, and had no such interview and quarrel with Mrs. Hall as testified to by Smith, either in going there, while there, or after they left, or at any other time or place; that his relations with Mrs. Hall were friendly and pleasant, but in no particular, or at any time, improper or unfriendly; that she was his cousin and he treated her at all times, and in every way, as a sister; that he was not out of Brookfield that night after his said arrival in the evening; that he knows nothing about the killing of Mrs. Hall and her children, the burning of the house and their remains, the production of the abortion, burial of fetus, or any other of the accompanying facts and circumstances, appearing in evidence; that he knows nothing about the track made and followed from Mrs. Hall's to Brookfield, or the person who made the same; or of the track or person made or chased within the city limits, and described in the record; that while in the city he was engaged in the business transactions mentioned and appearing in evidence to about eight o'clock, as the witnesses say, and as he claims to a considerably later period; that after that he amused himself and employed his time while waiting for the expected train to Laclede, in the manner hereinbefore claimed in his behalf, and, that the expected trains failing to arrive, he proceeded to the Babb Hotel, registered his name, called for a room and went to bed at about half after two o'clock; that some thirty or

thirty-five minutes thereafter he was aroused and arrested by Critchfield and others. Denies all charges and imputations against him by Critchfield and others; denies his identity with the party making the track out of the city, or the party seen and chased in the city, as testified to by witnesses for the state, and avers his entire innocence of the crimes charged against him, or any knowledge thereof. Also denies his ownership of the "link" found in his possession when arrested, and claims that it belonged to witness Smith, who, for his own convenience, had left it with defendant and had requested him to bring it up to him, and that he had put it in his pocket for the purpose of being turned over to Smith, who, as before stated, on his cross-examination at first denied, but afterwards admitted, defendant's statement in regard to his having requested defendant to bring the link to him, and that he wished to get it, but claimed that defendant refused to let him have it.

That no *other motive* for the commission of such an offense has been developed, or no other named party has been arrested for its commission, may possibly be accounted for, it is claimed, for the reason that in the frenzy, incident to the defendant's arrest under the circumstances, and the accusation then or subsequently brought against him, no effort has been made to find *another* clue for its perpetration, or the possible *real offender* tracked to Brookfield and pursued in the city limits, who, after defendant's arrest and the subsequent diversion of suspicion from all other parties, had at least temporary security and ample time, in which to make good his escape, or to take such cautionary steps as he might deem proper for quieting suspicion and securing his personal safety. Murder and arson, it is said, are not unfrequent crimes (as the telegraph and daily press verify), committed sometimes for robbery, at others to gratify lust on defenseless females, or satiate some other

base passion of hate, malice or revenge, and which remain mysteries for years, despite all the efforts and ingenuity of professional detectives and others.    It is also said that the advices and ingenuity of criminals to cover up and conceal crime, or, by the fabrication of delusive facts and circumstances, divert suspicion in a wrong direction to the peril of innocent parties, is indeed wonderful as the annals of criminal jurisprudence abundantly attest.

It is further claimed that outside of what Smith makes defendant say, in reference to the alleged talk, in the neighborhood about himself and Mrs. Hall there is no other evidence, in the record, that there ever was any such talk.    In addition it is claimed by the defense that it appears in evidence that the witness Smith, himself, was well acquainted with Mrs. Hall, and a visitor at her house, and that Smith resided in less than one-half mile of Mrs. Hall, ever since he came to the country.    It was also in proof, in defendant's behalf, by depositions of a number of merchants and business men and acquaintances of the defendant, residing in the neighborhood in Ohio, where the defendant was raised and resided up to the time of his recent removal to Missouri, that he bore a good character as a peaceable and and law-abiding citizen as well as for truth and veracity. But all these matters and questions were for the jury under proper instructions from the court.

It is not our province, as has frequently been held, to try cases upon their facts, but rather to determine what inferences may legitimately be drawn from them. As was said in a recent case of "circumstantial evidence," "the rule, even in criminal cases, is, that before the court will relieve on the ground that the verdict is not supported by the evidence there must be either a total failure of evidence, or it must be so weak that the necessary inference is that the verdict is the result of passion, prejudice or partiality." *State v. Glahn*, 97 Mo. 689.    See, also, *State v. Cook*, 58 Mo. 546; *State v.*

*Musick*, 71 Mo. 401; *State v. Zorn*, 71 Mo. 415, and *State v. Thomas*, 78 Mo. 342.

Without especially referring to the facts and circumstances in evidence, it may be conceded that while some of them may appear irreconcilable and unaccountable, all of which under proper instructions from the court was matter for the consideration of the jury, yet, under our repeated rulings, *supra*, it must be held, that the position of defendant's counsel, "that the evidence disclosed by the entire record was insufficient to justify or support the verdict of the jury," is not well taken, and is, accordingly, overruled.

At the conclusion of the evidence a number of instructions were asked on both sides, some of which were given and others refused. Those deemed material to the proper disposition of the case, and the ruling touching them, will appear in the further progress of this opinion.

Instruction number 7, asked by defendant and refused by the court, is as follows : " 7. The court instructs the jury that in considering the question as to whether or not the defendant is guilty or innocent of the crime imputed to him, the jury should take into consideration and duly weigh, along with the other evidence in the case, the evidence offered by defendant as to his previous good character as a law-abiding and peaceable person."

The court of its own motion wrote and gave the following instruction:

" If, from the evidence in this case, you find that the facts and circumstances proven and relied on to establish the defendant's guilt are in doubt, and that the defendant has, by evidence, satisfied you that he is a man of good character, then you should take the evidence of such good character into consideration together with all the other facts and circumstances in evidence in determining the guilt or innocence of the defendant."

The objections and exceptions of defendant to the action of the court, in reference to both instructions, are duly preserved in the record.

The court, over the objection and exception of the defendant, gave the following instruction at the instance and in behalf of the state: "7. The court instructs the jury that as one of the defenses interposed by the defendant is what is known in law as an *alibi*, that is, that the defendant was at another place at the time of the commission of the crime charged in the indictment, you are instructed that the burden of establishing such defense devolves upon the defendant, and, unless he has so shown to your satisfaction, it is your duty to disregard such defense."

Instruction number 10, asked by the defendant and refused by the court, reads as follows:

"10. The jury are instructed, if they have a reasonable doubt that the defendant committed the homicide alleged in the indictment, or was absent at the time said homicide is alleged to have been committed, they will find a verdict acquitting defendant."

The two instructions, first above set out, being of a kindred character and touching the same subject, will be taken and considered together; so of the latter two.

The usual instruction to the effect "that the jury must be satisfied of defendant's guilt, as charged, beyond a reasonable doubt," was also given, both at the instance of the state and the defense. The trial court, in the instruction given of its own motion, evidently adopted the theory of the earlier cases on this subject, where it was held that evidence of character was only admissible in "doubtful cases;" but the latter, and, as we apprehend, better considered, cases hold to the contrary. Wharton's Criminal Evidence [8 Ed.] section 66, uses this language: "It has been argued by high authorities, that good character is of weight only in doubtful cases. But the better

opinion is to the contrary. In the first place it is conceded on all sides that evidence of character, when offered by the defense in criminal cases, is always relevant." In 3 Greenleaf on Evidence, section 25, this language occurs: "Upon the admissibility of *evidence of character*, whether of the prisoner, or of the party on whom the crime is alleged to have been committed, there has been some fluctuation of opinion." * * * "I cannot, in principle," said Mr. Justice PATTERSON, "make any distinction between evidence of facts and evidence of character. The latter is equally laid before the jury as the former, as being relevant to the question of guilty or not guilty. The object of laying it before the jury is to induce them to believe, from the improbability, that a person of good character should have conducted himself as alleged, that there is some mistake or misrepresentation in the evidence on the part of the prosecution, and it is strictly evidence in the case. The admissibility of this evidence has sometimes been restricted to *doubtful* cases; but it is conceived that if the evidence is at all relevant to the issue, it is not for the judge to decide, before the evidence is all exhibited, whether the case is in fact doubtful or not; nor indeed afterwards; the weight of the evidence being a question for the jury alone. His duty seems to be to leave the jury to decide upon the whole evidence, whether an individual, whose character was previously unblemished, is or is not guilty of the crime of which he is accused."

But we are not without express authority in the prior rulings of this court upon the same subject. The foregoing views from Wharton and Greenleaf are cited and approved in *The State v. Alexander*, 66 Mo. 148, 160 and 161, and also in the case of *The State v. McNally* 87 Mo. 645, 658, 659. In the first of these cases, page 161, this court uses this language: "The admissibility of this evidence has sometimes been restricted to doubtful cases, but in such cases the accused is entitled to an

The State v. Howell.

acquittal without regard to character, and evidence of good character is offered to make a doubtful case."

In the second, pages 658 and 659, this language occurs : "Evidence of good character is always to be considered by the jury in making up their verdict as to the guilt or innocence of the accused, just like any other fact in the cause; and no distinction is to be taken between evidence of fact and evidence of good character. If all the other evidence taken by itself proves the prisoner guilty, the jury are not at liberty, for that reason, to fail to consider evidence of this character."

It must, therefore, be held, and it is accordingly so ruled that the trial court erred in the above instruction of its own motion. It is also insisted by defendant's counsel that the court erred in giving the first and refusing the second of said instructions in reference to an "alibi." On this question the rulings of this court have not been entirely uniform. In support of the first of said instructions, being number 7, given by the court for the state, we are cited to the case of State v. Jennings, 81 Mo. 185, and at pages 189 and 190. This case, it must be conceded, is authority for that position, but it cites no authority, judicial or elementary, for its support; nor is any reference made to a prior ruling of this court in State v. Lewis, 69 Mo. 92, where the contrary doctrine is held. See first head note and pages 94 and 95.

Wharton's Criminal Evidence [8 Ed.] section 333, uses this language : "It has been said that an 'alibi' is so far a confession and avoidance, that it must be proved by a preponderance of proof. But an alibi not only goes to the essence of guilt, but it traverses one of the material averments of the indictment, that the defendant did then and there the particular act charged. To hold that, though the defendant casts a reasonable doubt on the averment of his co-operation in the guilty act, he must be convicted, unless he establishes such

non co-operation, by a preponderance of proof, is to fall into the error above noticed of confounding burden of proof with presumption of innocence.

Undoubtedly, if the prosecution makes out a case sufficient to secure a verdict of conviction, then the burden is on the defendant to prove his defense. But when his proof is in, then the final question is, are the essential averments of the indictment proved beyond reasonable doubt? And among these essential averments is the defendant's participation in the act charged?"

To the same effect is the ruling of the St. Louis court of appeals in case of *State v. Kelly*, 16 Mo. App. 213.

The supreme courts of Indiana, Iowa and Texas, in well-considered cases, have also approved and announced, in express terms, the same doctrine. See *Howard v. The State*, 50 Ind. 190; *The State v. Hardin & Henry*, 46 Iowa, 623, and *Walker v. The State*, 42 Tex. 360. In the case of *People v. Fong-Ah-Sing*, 64 Cal. 253, this whole question of *alibi* and reasonable doubt combined is presented with unusual force, clearness and ability in the instruction asked for defendant, and approved by the supreme court in an opinion of equal point, brevity and perspicuity. The instruction is in the following language: " 'Whilst the prosecution must establish beyond a reasonable doubt the guilt of the defendant, it is not incumbent on the defendant to prove an *"alibi,"* beyond a reasonable doubt. Though the evidence offered to establish an *alibi* falls short of the weight of moral certainty as to the existence of the *alibi*, yet, if it leave in the minds of the jury such a doubt or uncertainty, that, taken by itself, they could not find for or against the *alibi*, they are bound to carry such doubt into the case of the prosecution, and to array it there, as an element of the reasonable doubt, beyond which the prosecution must establish guilt. The

The State v. Howell.

defendant is entitled as much to the benefit of such doubt as to any other doubt raised by the evidence; and if its weight alone, or added to that of any other, be sufficient to reduce belief in their minds as to defendant's guilt to a reasonable doubt, they must acquit.' This instruction the court below refused to give, but in its stead gave the jury as the law upon the subject of *alibi* the following: 'If the jury find the defendant to have been at another place, as for instance in the society's rooms which have been spoken of in the evidence, at the time of this alleged shooting, and if his being there then creates a reasonable doubt of his having been present at the place of the alleged crime at the time of its alleged commission, he should have the benefit of that reasonable doubt and be acquitted.' "

In disposing of these instructions, the court proceeds to say: "The instruction requested was substantially correct, and should have been given. The charge given was incorrect, and should not have been given. The commission of a criminal offense implies, of course, the presence of the defendant at the necessary time and place. Proof of an *alibi* is, therefore, as much of a traverse of the crime charged, as any other defense, and proof tending to establish it, though not clear, may, nevertheless, with the other facts of the case, raise doubt enough to produce an acquittal. A reasonable doubt of the defendant's presence at the time and place, necessary for the commission of the crime, would seem necessarily to raise a reasonable doubt of his commission of it. But according to the charge of the court below the defendant was not to have the benefit of any doubt in regard to the alleged *alibi*, unless the jury should *find as a fact* that he was at another place than the place of shooting when the shooting occurred. It is obvious that the finding of that fact would itself have established the *alibi*, and that would have ended the case of the prosecution. But proof tending to establish an

*alibi*, though insufficient of itself to establish that fact, is not to be excluded from the case. Whatever doubt, if any, such testimony may raise in the minds of the jurors is for their consideration; and if its weight alone, or added to that of other evidence in the case, be sufficient to reduce belief in their minds, as to the defendant's guilt to a reasonable doubt, they should acquit, for in every criminal case, when all the proof is in, the final question for the jury is, are all the essential averments of the indictment proved beyond a reasonable doubt?"

This cogent reasoning of the court presents the correct law, both as to *alibi* and *"reasonable doubt."* We hold, therefore, that the views expressed, on this question in the case of *State v. Jennings, supra,* are not well considered and should no longer be adhered to.

For the reasons hereinbefore expressed, we are of opinion that the trial court erred in its said rulings, and for that reason its judgment is reversed and the cause remanded for a new trial in conformity hereto, in which all the judges concur, except BARCLAY, J., who concurs in the result.