Gantt, J.
(dissenting). — I do not concur in the opinion of the majority. As stated therein this is an original proceeding in this court at the relation of the attorney general to disbar the respondent, A. W. Mullins, a member of the bar of this state.
These proceedings originated in the prosecution of Joseph A. Howell on the nineteenth day of January, 1889. The respondent, Major Mullins, was employed by Howell as his attorney, in the case tried in the Linn county circuit court, resulting in the conviction of Howell of the murder of Nettie Hall. After the overruling of the usual motions, the defendant was sentenced to be hanged and applied for, and was granted, an appeal to this court. At the April term, 1890, of the supreme court of Missouri, the judgment of the Linn circuit court was reversed and the cause remanded. Upon the case being redocketed in the Linn circuit court, the defendant applied for, and was granted, a change of venue and the case ordered transferred to the Grundy circuit court. Up to this time Major Mullins had been the sole and only counsel or attorney representing Howell. The record (100 Mo. 628) discloses the fact that Major Mullins appeared in this court for Howell. Upon the case being docketed in the Grundy circuit court Messrs. Harber & Knight, a firm of attorneys at Trenton, Missouri, became associated with Major Mullins in the defense of Howell. The cause was again tried and resulted in a hung jury; was continued and an affidavit filed against Judge Burgess, the circuit judge of that circuit, and judge O. H. S. Goodman was called to try the cause. The defendant *244 was again tried at the August adjourned term, 1891, convicted of murder of Nettie Hall and sentenced to be hanged; applied for and was granted an appeal to this court.
On January 23, 1893, a transcript of the bill of exceptions in the case of state of Missouri against Joseph A. Howell was filed in the office of the clerk of the supreme court and the cause set for hearing at the April term, 1893, of division number two. On April 11 the cause was argued orally and submitted with briefs. Major A. W. Mullins, who was the senior counsel in this case, and whose name was signed to the printed briefs, assisted the other counsel in the oral argument of the cause. In both the printed brief and oral argument, two points were urged for reversal with greater prominence than any others: First, that the-evidence upon the trial did not establish the alleged homicide, the death or identification of Nettie Hall, the person charged in the indictment to’have been murdered by the defendant, or the corpus delicti; second, that the cross-examination of the defendant was unwarranted by the law or facts, in this, that upon the trial the court permitted the state to cross-examine the defendant about matters not testified to by him in chief.
Defendants counsel prepared a printed statement and abstract of the evidence, in which was made to appear that there was no testimony upon the trial to identify the dead body of Nettie Nall, or to establish the fact that she was dead, and there was also inserted therein an alleged cross-examination of defendant upon said trial, which, if it had occurred, was wholly unwarranted in law, and of itself sufficient to reverse the case.
After the case was argued and submitted, it was discovered by the representatives of the state that the bill of exceptions on file in the office of the circuit clerk *245 of Grundy county, and transcript thereof of record in this court, was false in two essential particulars, viz.: that it omitted the testimony actually given to show the corpus delicti, and that the cross-examination of the •defendant, as it appeared in the bill of exceptions and transcript, did not occur upon the trial, but had been wholly manufactured and inserted for the purpose of misleading and deceiving the supreme court, and thereby securing a reversal of said cause. These facts were, by motion of the attorney general, called to the attention of division number two of this court; the order of submission was set aside, and a rule made upon Judge Goodman, the judge who tried the cause, to proceed to Trenton and hear and ascertain if said bill of exceptions was a forgery, and, if so, correct and restore the bill of exceptions so as to report the testimony actually given upon the trial, as he might find from the notes of the stenographer taken at the trial at the time, and from any other evidence that might be submitted to him.
In obedience to this rule of the supreme court, Judge Goodman proceeded to, and did, correct the bill of exceptions, and transcript thereof, and under his hand and seal certified the true and correct transcript to this court. After an examination of the proceedings before Judge Goodman, and his report to division number two, this court entered an order of record approving in all things the action of Judge Goodman, together with the report made by him. The cause was then set down anew for brief and argument, and an additional brief was filed upon the part of the state, but none was filed upon the part of appellant; and on May —, 1893, the cause was submitted without oral argument, and by ■division number two of this court the judgment was affirmed, and the defendant hanged.
The testimony in this proceeding discloses the additional facts .that Mrs. Josephine H. Yandervert, *246 now Mrs. Judge Goodman, was the duly appointed official stenographer at the trial of Howell at the August adjourned term, 1891; that as such official stenographer she wrote in shorthand the testimony of all the witnesses, both upon the part of the state .and the defendant; that after defendant’s conviction and sentence and the overruling of his motion for new trial, Mrs. Vandervert, at the request of appellant’s counsel, furnished two typewritten copies of the evidence, one of, which was made for the circuit clerk, the other for the attorneys representing Howell, to be used in the preparation of the bill of exceptions upon the part of defendant. These transcripts of the testimony contained the true testimony of the witnesses as given upon the trial, and in them appears the positive testimony of Hall, Torce and others, identifying the body of Nettie Hall on the night of the homicide at the burning building There did not appear in the transcripts made by the official stenographer the cross-examination of the defendant, Howell, of which appellant complained in division number two of this court. These transcripts were sent to Messrs. Harber & Knight, at Trenton; when received by them, one copy, instead of being delivered to the clerk, was sent' to A. W. Mullins at Linneus, and was returned by him, after an examination, to Messrs. Harber & Knight.
In the meantime Messrs. Harber & Knight had prepared a bill of exceptions, as the testimony shows, in which every particle of the testimony tending directly or indirectly to establish the corpus delicti had been extracted and removed from said transcript as furnished by the official stenographer; and in order that the same number of pages might be preserved in the transcript, other matter, wholly fictitious, and not testified to by any witness upon the trial, was inserted. In addition to this, in the cross-examination of the defendant *247 pages of questions and answers had been extracted, and false and mamfiaetured matters, questions and answers that had not been ashed or given on the trial, had been inserted. The testimony shows that the object of so changing and falsifying the transcripts of the evidence furnished by the official stenographer was for the purpose of misleading deceiving and inducing division number two of this court to reverse the judgment of the trial court, and either discharge the defendant or remand the cause.
It appears from the evidence in this proceeding that after this false bill of exceptions had been filed, appellant’s counsel, Mr. A. G. Knight, made, or assisted in making, a transcript of the same, to be sent, and which was afterwards sent to this court.
The testimony in this case shows, and is uncontradicted, that Major A. W. Mullins was the senior counsel in this case; had the management of it; had tried it in Linn county before the change of venue to Grundy; had appeared in the supreme court on an appeal from the judgment of the Linn circuit court (100 Mo. 628); that upon the trial and conviction from which this appeal was taken, he argued an application for continuance, and when the same was overruled he assisted in challenging the jury; he made the opening statement to the jury on the part of the defendant; he cross-examined the state’s ivitnesses, including Hall, Vorce, Orr and Moore; he examined the defendant’s witnesses, including the defendant Howell; he made the closing argument to the jury upon the part of the defense; he argued the motion for new trial orally before Judge Goodman, and never, at any stage of the proceeding in the circuit court, did he or anyone representing Howell, mahe the contention that the defendant had been improperly cross-examined, or that the testimony failed to establish the death of Nettie Hall or her identification; hence, *248 Major Mullins must - have known that no improper cross-examination of the defendant had occurred upon the trial, and that the testimony established beyond peradventure the death and identification of Nettie Hall; for, not only was he familiar with all the facts and circumstances of the case, but it appears that he carefully examined the transcript of the evidence containing the proof of the death and identification of Nettie Hall, and the correct, direct and cross-examination of the defendant, as indicated by his memoranda thereon down to and including the six hundred and twelfth page thereof. . •
It further appears from the testimony that on May 19, 1892, just one month after the signing of the bill of exceptions by Judge Goodman, Mr. A. G. Knight notified Major Mullins, in a conversation at Princeton, that the bill of exceptions did not contain a particle of testimony proving or tending to prove either the death or identification of Nettie Hall; that at that conference Major Mullins replied to Mr. Knight, in substance, that if the bill of exceptions failed to show these facts the judgment would of necessity have to be reversed. It is shown that Mr. Knight informed Major Mullins that there was sufficient improper cross-examination of the defendant Howell, shown in the bill of exceptions, to reverse the case, and that the record showed, as fixed by him, an improper cross-examation. Knight testified that he told Major Mullins in that conversation at Milan that he, Knight, had made a bill of exceptions, and induced Judge Goodman to sign it, which failed to show any proof of the corpus delicti, the death or identification of Nettie Hall, but which did show an improper cross-examination of the defendant sufficient to reverse the case. This conversation between Mr. Knight and Major Mullins was eleven months before the filing of the brief and oral argument in the cause in the supreme court. *249 It also appears that in May, 1892, Major Mullins was notified by Mr. Harber, in substance, that the state would never be able to show the death or identification of Nettie Hall from the bill of exceptions as filed.
In this manner the knowledge upon the part of Major Mullins of the deceit practiced upon the trial judge, and of the preparation to perpetrate the additional fraud and deceit upon this court, is shown.
It further appears that Messrs. Harber & Knight prepared the statement and brief in State of Missouri v. Joseph A. Howell, filed in division number two of this court, and that Major Mullins’ name is affixed thereto. It is also shown by the testimony that on the afternoon of April 10, 1893, Major Mullins and Messrs. Harber & Knight met in Jefferson City, where a conference was had between them in regard to the argument of the case on the following day in division number two of this court; that at this conference the points suggested in the printed abstract, brief and argument were discussed, and the arrangement usually made among attorneys in regard to oral arguments was agreed upon. One of the briefs, abstract, and argument to which his name was attached was there given to Major Mullins and examined by him the day or night before the cause was set down for hearing in this court. In that brief among other things are to be found the following, on pages 19 and 23 thereof:
“points and authorities.
“I.
“ The evidence on the trial does not establish the alleged homicide or death of Nettie Hall, the person charged in the indictment to have been hilled and murdered by the defendants ('Citing numerous authorities, j
*250 “(23)
“VIII.
“ There was. not sufficient evidence, in fact there was not even a scintilla of evidence, to justify or support a finding that Nettie Hall was dead, or that any of the remains were identified as her remains, and therefore ■defendant’s instruction that ‘under the law and the evidence the jury must find the defendant not guilty,’ should have been given and the defendant acquitted; he is therefore entitled to his discharge here.” (Citing authorities.)
In the brief, referring to the cross-examination of defendant, his counsel said, on page 20 thereof:
“II.
“The cross-examination of defendant was unwarranted by the law or facts. The law permitted no cross-examination of him upon matters of which he had not been examined in chief; he was not examined in chief in reference to what he had sworn upon any previous trial of this case as to the giving or writing of any letters to Orr, or the giving of a key to said Orr. Nor was he examined in chief concerning one Henry Thornton, the seeing of, or giving or offering him a cigar. We doubt if a more flagrant disregard of the defendant’s rights can be found in the books than appear in this.”
In the printed argument in the same exhibit, the following language referring to the proof of the corpus delicti, is used:
“(24)
“argument.
“L
“The allegation of the indictment ‘that Nettie Hall is dead,’ was unproven at the trial.
*251 ‘ ‘As we understand the law, the very basis of a corpus delicti is the proof'that, the person charged to have been slain is dead, and that the discovered body or remains be identified as those of such alleged deceased persons, before the next step in the process — i. e., the criminal agency of defendant in such death — becomes important; or as it is sometimes put, ‘beyond the death and the violence remain the two inquiries to which the ascertained criminal fact gives rise: who is the slain, and who the slayer? the identity of the one, and the agency of the other.’
“It was therefore incumbent upon the state to prove that Nettie Hall was dead; that she came to her death by violence; and the defendant’s criminal agency in producing such death.
“That the last two of the above propositions may be proven by circumstantial evidence we concede; but grave doubts arise as to whether the first of said propositions, to wit, ‘the death of Nettie Hall,’ can be proven by circumstantial evidence at all or not. ##*###**
“(26)
“But, conceding, for the sake of argument, that it was competent to prove the ‘death of Nettie Hall’ by circumstantial evidence, and the' state is in no better position on this record.
“For any decision or text writer that had held to the doctrine that such fact may be established by circumstantial evidence has invariably required that ‘the proof of death be so strong and intense as to produce the full assurance of moral certainty,’ or, as otherwise stated, ‘where presumption is intended to be raised as to the corpus delicti, that it ought to be strong and cogent.’
“In the light of this rule let us examine the probative force of the state’s evidence: Nettie Hall is *252 shown by the state to be at her mother’s house about three weeks prior to the alleged burning of such house on the nineteenth of January, 1889. This is shown by witness Henry Smith, who says on Sunday about three weeks prior to the nineteenth of January, 1889, he was at the house of Mrs. Minnie Hall, and that ‘the children were all there.’ (See Bill of Exceptions, pp. 226-241.) When thereafter does the state ever undertake to accownt for the whereabouts of Nettie Hall¶ They are content to leave this important question to conjecture. Was she in Missouri on the night of this tragedy, or in Kansas with the Jr. James Hall¶
“But it is shown by defendant in his evidence that
“(27)
Mrs. Minnie Hall and her children were at her father’s (their grandfather’s) at Sumner, Missouri, on the Sunday before the burning of this building. (See defendant’s evidence, p, 429.) This is uncontradicted by any witness and must be taken as true; if not true, it was easily within the power of the state to have contradicted it. Where was Nettie Hall on the night of January 19, 1889! Had she returned from her visit with her grandfather’s of the Sunday before! No witness so speaks. Indeed, if the facts and circumstances in this record tend to show anything on this question, they tend to show that the remains of but one little girl was ever found in the ruins of this building, for R. N. Vorce and Henry Smith say that one of the little girls fell right opposite the cellar door, and that they, pulled her out in front of the cellar door; and when it is remembered that this was done before the arrival of James Hall at the building, and that when he arrives he sees one of the little girls on the east side of the house against the cellar door, it is inferable that she was the same little girl that Vorce and Smith had pulled out previous, as *253 but one little girl had been rescued or but the one laid by the cellar door. It is not shown what the size of Nettie Hall was-. No toitness says that he Mew her, or that any of the bodies rescued resembled her. Not even a ventured guess by any witness that Nettie Hall was of the dead. The color of her hair, the kind of clothing, the personal marks of identity, if any, teeth, form or shape is all left, entirely so, to conjecture by this record. It is not even shown that search or any inquiry was ever made by any person for Nettie Hall. In fact, ‘all the circumstances proved by the state may well exist and still be entirely consistent with the fact that Nettie Hall was never murdered, and that she is still alive.’ It may well be doubted if this record discloses a single substantive fact capable of raising even a suspicion that Nettie Hall is dead; much more is it wanting in that chain of facts and circumstances
“(28)
so universally required, and denominated by the law as being ‘cogent and convincing, and excluding all other reasonable hypothesis.’. ‘Mere suspicion, however strong, will not supply the place of evidence, when life or liberty is at stake.’ * * * On the eighth point of our brief, we deem it only necessary to quote as follows: ‘The evidence for the state having been insufficient in law to make out the offense charged in the indictment, the defendant was entitled to a verdict of not guilty at the hands of the jury.’ He can not, therefore, on well settled principles, be subjected to another trial, but must be, by the judgment of this court, put in the position in which the verdict and judgment of the court below should have put him.”
In reference to the cross-examination of defendant, counsel said in their printed argument:
*254 “Y.
“The cross-examination of defendant is so flagrantly in violation of the statute, that we had thought it unnecessary to make any further comment upon it than made under our points and authorities, until our attention was called to the recent promulgation of this court in the case of the State v. Avery, 21 S. W. Rep. p. 199.
“In that case, the court, speaking through Buegess, Judge, sustains the cross-examination of defendant as proper ‘for the purpose of showing that the man Thompson was no other person than' the deceased, whom defendant had testified killed himself, and came within the express provisions of the statute confining the cross-examination in cases of this kind to the examination in chief.’
“But the learned judge goes further and says, ‘It was also competent for the purpose of laying the foundation to contradict him.’ This last paragraph is not sustained by any decision in this state, and must be considered as mere obiter dictum.”
After combating at length the decision in State v. Avery, the printed argument proceeds to say: “But to ignore the inhibition against the cross-examination of defendant about matters not referred to in his examination in chief, or to permit such examination under the pretext of ‘laying a foundation for his contradiction,’ renders worse than useless such statute. It, in fact, by judicial construction, turns a legislative enactment, which was intended by the legislature as a protection and benefit to defendant, into a delusion
“(35)
and a snare. What kind of a cross-examination must there be that can not be justified on the pretext that ‘it was for the purpose of laying the foundation to contradict him.r
*255 “The case at bar furnishes a good illustration of the fallacy of this claim. Prior to defendant being introduced, one Orr had testified that defendant had written him, Orr, some letters, asking him, Orr, to assist him, defendant, to escape;, that defendant had also given him, Orr, a key, that he, Orr, might aid defendant to escape.
“ On the cross-examination of defendant, he was ashed about the writing of the letters and giving of the hey to Orr, to aid him to escape,, and though he had not mentioned such matter, or even Orr, in his direct examination, he was compelled by the cotirt to answer such questions and thus contradict one of the state’s witnesses on a vital and important point. He was compelled to admit the damaging facts testified to by Orr. In these particulars and upon what pretext can this cross-examination be justified? Can it be said, you had to admit it and are therefore not hurt; or that you were being quizzed for the purpose of laying the foundation to contradict you? For if you had denied these statements of Orr, Orr would have been recalled, and contradicted you. The effect of this would be, in all cases where defendant becomes a witness, he can be compelled to corroborate the state’s witnesses, or if he fail to so do, contradicted by them, and such cross-examination justified. Not on the grounds of compelling the defendant to corroborate witnesses on material facts against him, but if the reasoning in the Avery case is to be followed on the assumption that he would deny such facts, and was being asked in reference thereto that he might be contradicted. But suppose, as in this case, defendant is compelled to corroborate, to admit the damaging facts
“(36)
testified to against him, we ask in all seriousness upon what ground can such cross-examination be justified. *256 The competency of such cross-examination can not justly be made to depend upon defendant’s answer, but if, in making answer, he is compelled to give evidence against himself, admit the damaging facts testified to by other witnesses, then no contradiction can be had, but if he denies such conversation (or facts), then it is said the examination was proper to lay the foundation for his contradiction.”
“On the further cross-examination of defendant, and before one Henry Thornton was examined, the state (evidently having been posted as to what the testimony of Henry Thornton would be in reference to the time of him, Thornton’s, seeing defendant and offering him a cigar, and desiring to break the force thereof in advance), asked defendant on cross-examination, and he was compelled to answer that he did not see Henry Thornton and give him a cigar on the night of the alleged tragedy, and this, too, though no mention was made of Henry Thornton by defendant, in his examination in chief. When Henry Thornton was examined he testified to the seeing of defendant upon the night mentioned, and defendant’s offering him a cigar. Then defendant is compelled in advance to contradict his own witness; was this in order to lay the foundation to defendant’s contradiction? It was certainly improper in any view of the case.
“Not content with making defendant corroborate D. C. Orr, one of the states’s witnesses, ‘who comes dripping with slime,’ and contradict in advance his witness Henry Thornton, the state proceeds, with the consent of the court and against defendant’s objection, to cross-examine him about what he had previously testified on the trial of this cause. Why this? Did the state desire to show defendant’s lack of memory, create the impression with the jury that he was testify-
*257 “(37)
ing differently from what he had previously testified, without daring to give him the benefit of his previous testimony, or was it for the purpose of laying the foundation to contradict him? This was unnecessary and highly improper. All that he had said in his previous testimony or in reference to this ease was competent,’ and no foundation was necessary to be laid to warrant its admission. The dictum in the Avery case, before mentioned, can not stand, and this court should take the first opportunity to express its disapproval thereof. The cross-examination of the defendant in the case at bar on the matters mentioned, and others that might readily be suggested, can not be justified by any legitimate process of reasoning, due regard being had to the constitutional and statutory rights guaranteed to a defendant on trial of his life.
“The evidence in this cause being, as it is, clearly insufficient to establish the death of Nettie Hall, we might well have contented ourselves by simply calling attention thereto, and our confidence in this point is our excuse for not mentioning, in this argument, points fatal to the action of the lower court, to which attention is called under our ‘points and authorities.’ But, the action of the lower court in overruling defendant’s application for a continuance, by reason of the state admitting the statement of Wm, Adams as his evidence, and in admitting evidence of defendant’s ■ attempts to break jail after his conviction, and the giving of instruction number 9, calling the jury’s attention specifically to said attempts and the unfavorable presumption to be drawn therefrom, without mentioning the fact that he was then under sentence of death, or telling them that they might take that fact into consideration, in determining what weight *258 should' attach to said attempts, as well as its action in giving instruction number four, by which defendant is singled out and the jury virtually told to view with suspicion (and disregard, unless corroborated) his evi-
“(38)
dence and the cross-examination of defendant, are all so far-reaching in their effects, and grossly improper, that we deemed it our duty to call the attention of this court thereto, that it might set right the dictum in the Avery case, and express its disapproval of the action of the nisi prius court on the other matters mentioned, and this we trust the court will do, even though it does, as we respectfully submit it must, hold the evidence insufficient and order defendant discharged.
“Respectfully submitted,
“A. W. Mullins and “Harder & Knight,
“Attorneys for Defendant.”
It further appears that on April 11, 1893, the case of State v. Howell was duly called in division number two of this court and Messrs. Harber and Knight and Major Mullins, all three, appeared for the defendant. The briefs filed by them were presented to the court and Major Mullins made an oral argument in which he insisted the judgment of the circuit court should be reversed on the two grounds, first, that there was no evidence of the corpus delicti; and, second, the improper cross-examination of the defendant.
The marshal of the supreme court testified that while Major Mullins urged a reversal on these grounds, he modified his position by stating that if the evidence of the corpus delicti was not in the record and the cross-examination appeared therein as abstracted by his associate counsel, then a reversal must result.
In view of the foregoing facts on the twenty-fifth day of June, 1891, the attorney general filed an infer *259 mation in this court and asked for a rule on respondent to show cause why he should not be suspended from the practice of law and his name stricken from the roll of attorneys of this court. The charge in the information is that the respondent A. W. Mullins was a duly licensed, sworn and enrolled attorney at law in the courts of this state, and, as such, an officer of this court and had been guilty of deceit, malpractice and unprofessional conduct, in that the said A. W. Mullins well knowing that the witnesses James Hall and R. N. Yorce had testified on the trial of said Joseph A. Howell in the circuit court of G-rundy county, that they identified the body of Nettie Hall, charged, in the indictment in said cause, to have been murdered by said Joseph A. Howell, and that D. C. Orr and James C. Moore had testified that the defendant, Joseph A. Howell, in conversations had with him while confined with him in jail at Linneus, Missouri, admitted or confessed his guilt of the murder with which he was charged, and that the defendant, Joseph A. Howell, in his testimony máde frequent mention of and reference to the deceased Nettie Hall; that said Howell was not cross-examined by the counsel for the state about matters to which he had not testified in chief; and that the transcript of their testimony in the bill of exceptions had been changed, falsified, spoliated and interpolated as aforesaid, falsely, fraudulently, and for the purpose of deceiving the supreme court, and thereby securing a reversal of the judgment in this cause, prepared and caused to be filed in the office of the clerk of the supreme court an abstract of the evidence, brief and argument, in which the testimony of the witnesses before named was changed, mutilated, spoliated and interpolated, as above particularly set forth; that said A. W. Mullins, after having caused said false abstract of the evidence, brief and argument in said cause, to *260 be filed in the office of the supreme court, appeared before said court at the April term, 1893, and in an oral argument made in the case of the said Joseph A. Howell, for the purpose of misleading and deceiving said supreme court, and thereby securing a reversal of the judgment of the trial court, contended and insisted that the printed copies of the evidence, brief and the-argument filed by him in said cause, truly and correctly presented the facts in said case, and that no evidence had been adduced upon said trial, proving or tending to prove the corpus delicti, and that the defendant had been improperly cross-examined; when in truth and in fact the corpus delicti had been proved, and defendant had not been improperly cross-examined.
The order to show cause was granted on July 9, 1894, returnable on the first day of October term, 1894. On October 9 respondent made return in which, he shows that for thirty-seven years he has been an attorney and counselor at law, duly licensed, enrolled and authorized to practice in the courts of this state; denies that he has been guilty of any deceit, malpractice or unprofessional conduct as attorney as alleged in relator’s petition or otherwise. Respondent says it is true that at the August adjourned term (October), 1891, of the circuit court of Grrundy county, Missouri, Joseph A. Howell was tried and convicted of murder in the first degree; that respondent was one of the attorneys retained by the father of said Howell to assist in defending him with respect to the alleged crime of which he stood charged; that upon the conviction of said Howell an appeal was applied for and granted to the supreme court of Missouri; that upon the trial of said cause in the circuit court of said Grrundy county, at the term aforesaid, stenographic notes of the evidence of the witnesses who testified orally in court, or part thereof, including the evidence of James Hall, R. N. Yorce, D. *261 O. Orr and James O. Moore for the state, and the defendant, Howell, who testified in his own behalf, were taken by the person appointed by the judge, who presided at the trial of said cause, under the law relating to stenographers in counties in this state having a population of forty-five thousand inhabitants or less; but said law, as respondent avers, was not complied with by said judge in making such appointment, and that said notes, or some of them, after the lapse of considerable time, as respondent is informed and believes, were written out in long hand by said stenographer. But respondent denies that the said testimony and the said testimony and the proceedings in said cause were correctly taken or correctly transcribed by said stenographer. He then avers the preparation of the bill of exceptions by Messrs. Harber & Knight in his absence and that the same was signed by the judge who heard the cause, and then pleads as follows:
“But respondent states and avers the fact to be that he does not know what said bill of exceptions contains with respect to the evidence of said James Hall, R. N. Yorce, D. C. Orr and James O. Moore, or •either of them, or the said défendant Howell, and that he has never read the same, or even seen said bill of exceptions. That it is not true the respondent knew that the said witnesses' aforesaid and mentioned by relator had testified as stated by him, or that the transcript of their testimony in the bill of exceptions had been changed, falsified, spoliated or interpolated, as alleged, and changed by him. And it is not true that respondent prepared an abstract of the evidence, brief and argument in said cause to be filed in the office of the clerk of the supreme court.
“Respondent admits and says it is true that at the April term, 1893, he appeared in said supreme court and made an oral argument on behalf of the said *262 appellant in said canse, and that such argument was based on the record'then existing in said cause, and that he would not have been justified in arguing, or permitted to argue, matters not contained in the said record; but respondent says it is not true that he made said argument for the purpose of misleading or deceiving the supreme court; that on the contrary, the said argument was made to said court in the utmost good faith, with the full belief on respondent’s part that the said bill of exceptions and record, as made and signed by the trial judge, did not contain the matters set out in relator’s petition.
“Respondent further says that it is not true that the said record was ever at any time changed, falsified, mutilated or interpolated, as alleged in said petition or otherwise; but that on the contrary, respondent is informed, and verily believes, that the said record as made, signed and sealed by the trial judge, was not in any manner, nor at any time whatever, by any person whomsoever, changed, mutilated, falsified, spoliated or interpolated, as in the relator’s petition stated, or otherwise. Respondent denies each and every statement and allegation.”
Under the order for taking evidence, the facts already detailed appeared. Respondent did not testify in his own behalf. When the evidence was all in he submitted a motion to dismiss, which was overruled. The cause was argued orally on the twenty-sixth day of February, 1895.
I. I fully concur with the majority of the court that this proceeding was properly and appropriately commenced by the attorney general, and that it was not only his right but his bounden duty to have instituted it, and that the jurisdiction of this court to suspend or disbar a member of the bar of this court for malpractice or deceit in his professional conduct in *263 matters pending in this court is inherent in the constitution of the court, independent of the statutory proceedings provided in sections 611 et seq., Revised Statutes 1889.
I also fully agree with the majority of this court that “the evidence shows that respondent must have Jmotvn at the time of the trial and conviction of Joseph A. Rowell at the August adjourned term, 1891, of the circuit court of Grundy county, for killing and murdering Nettie Hall, and the argument by him before the jury, and of the motion for new trial after conviction, that the corpus delicti had been proven,” but I go further. I assert that the evidence leaves no doubt that Major Mullins knew when he tried this cause, occupying as he did the position of leading counsel for Howell, and conducting the examination of the witnesses in his behalf and the cross examination of the state’s witnesses, that the false and fictitious cross-examination that afterward appeared in the fraudulent bill of exceptions filed in this court never occurred.
When informed by Messrs. Harber & Knight that the bill of exceptions contained no proofs of the corpus delicti he knew then that if their statement was true the bill was false, and that if permitted to go unchallenged must result in a* reversal of that judgment by falsehood and deceit. He knew, moreover, when informed by Messrs. Harber & Knight that the bill of exceptions as first signed by Judge Goodman contained a cross-examination of the defendant, Howell, which was forbidden by the statute law of this state, that. if their statements were true it was an untrue and false bill of exceptions.
But more than this, on the tenth day of April, 1893, the respondent came in person to Jefferson City, the day before the hearing of the Roivell case. He met here both Messrs. Harber & Knight. They gave him *264 a copy of the brief prepared by them to be filed in behalf of Howell, and to that brief,', the name of A. W. Mullins ivas signed. More- than that, they counselled together as to the order of argument and Major Mullins examined that brief. In that printed statement, under prominent headings and divisions, two distinct propositions are made. They were, first, that the record contained not a scintillav of evidence that Nettie Hall was dead; in other jwords, there was no evidence of the corpus delicti and the judgment must be reversed; second, there was an illegal and unwarranted cross-examination of defendant and that examination was set forth in the brief on page 7 thereof, and to attract the attention of this court and demonstrate at a glance the error in permitting it, this fictitious and forged cross-examination of Howell was placed in a parallel column with that of D. U Orr, and the defendant through his counsel is made to object “because said matters were not referred to by him in his examination in chief, and the objection was overruled and exception saved at the-time.” Now, it is not disputed that Major Mullins-conducted the examination of Howell and was representing Howell when the attorneys for the state cross-examined him, hence, when he read in the brief to which his name was attached the pretended cross-examination of defendant, as -it is shown he did on the day before he argued the cause in this court, he knew it was false.
But, more than that, the evidence discloses that, a copy of the official stenographic notes of the evidence was sent to Major Mullins' about April 1 and by him retained until April 20, 1892, and his memoranda on that copy discloses that he had read Howell’s examination and cross-examination as it actually occurred in the circuit court and he nowhere notes that-such an improper cross-examination had occurred or that he excepted to it. Moreover, that printed brief *265 on page 7 indicated that the improper cross-examination of Sowell luould he fownd on page 479 of the transcript filed in this court. The Sowell case was not argued until April 11, 1893. A moment’s inspection of the record on file in this court would have confirmed the statement of Messrs. Harber & Knight that the false matter was in the transcript.
Under such a state of facts how can it be maintained that respondent was not only not reprehensible but absolutely justifiable in urging this court to reverse a judgment of murder in the first degree because the corpus delicti was not shoivn, and because an improper cross-examination was shown by the fraudulent record that had been imposed upon the circuit judge and prosecuting attorney and this court?
The sole ground upon which his counsel seek to exculpate him, and the only one adopted by the majority of my brethren, is that counsel are bound by the record as filed in this court; that the record imports absolute verity, and this court would not have heard, or permitted him to have urged any fact outside of the transcript as filed.
In my humble judgment this is a total misapplication of the principle that the record imports absolute verity. The very fact that the record imports the truth demonstrates that the courts can not be too rigid or exacting in holding the members of the bar to a high standard of integrity and official conduct. The logic of the respondent is this:. “The oath of an attorney as well as the ethics of the profession from time immemorial forbid deception upon the court to obtain an advantage for himself or his client, but the record, once made up, imports absolute verity, and counsel are bound by the record; therefore though his associate counsel impose a false record upon the court, and though he is made aware of the fraud and deception, *266 yet he may, with perfect propriety, adopt that fraudulent record, base an argument and brief upon it, and then, if detected before the fraud is finally consummated, boldly rely upon the maxim that the record imports verity,” and he had a right to avail himself of it. That such reasoning should have weight with this court is incomprehensible. In my opinion no such response should be given to one thus alleging his own turpitude. Heretofore we have been taught that a “concocted and fraudulent verity” when unmasked and discovered ceased to be a verity. The universal doctrine of this court and all other courts is that even the most solemn judgments and records cease to be verities or records when once shown to have been obtained by fraud, covin and deceit, “for whatever fraud creates, justice will destroy.”
Such a use of this legal maxim is abhorrent to every principle of law and justice. Certainly it has no application in an investigation of this character, the purpose of which is to purge the rolls of the names of those by whose wrong the record in the Howell case, which should have spoken the truth, was made to speak a falsehood. In this proceeding the court should brush aside all such fallacies, for when the integrity of the record is challenged the search light of truth should be turned on, and no one be allowed to invoke the protection of a maxim of the law which he and his associates have profaned and disregarded. “The law, in such cases, is quick to discern the intents of men, and piercing even to the dividing of the joints and marrow of sham and pretense.”
The question here is- not what presumption this court, or* any other court, in a collateral proceeding, would have indulged as to the verity of the bill of exceptions in the Howell case as originally filed, but it is one involving the integrity of the court mak *267 ing that record and the protection of this court from fraud and imposition. In a direct proceeding we have been informed that an officer of this court has not regarded his official oath and has not demeaned himself faithfully but has imposed upon opposite counsel a skillfully contrived deception, and that in a case of the most supreme moment to the state. His client had been convicted of murder in the first degree and to that crime was superadded arson, and the burning of his victims, a mother and four innocent children. Before the bar of this court he confesses his dereliction. The supreme question in this particular case is whether his associate counsel, the respondent herein, can, with knowledge of his misconduct, voluntarily avail himself of the fruits thereof.
The modes of procedure and the machinery of the law are means, not ends, the final purpose of their creation and adoption is justice, and no lawyer in his zeal for the means is justified in thwarting the true end; otherwise a trial at law becomes a gladiator’s struggle for victory, or a piece of legerdemain in which the attorney who most skillfully covers his tracks and frauds will inevitably win.
Says the supreme court of Illinois in People ex rel. v. Beattie, 137 Ill. 553: “The lawyer’s duty is of a double character. He owes to his client the duty of fidelity, but he also owes the" duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession. He is an officer of the court — a minister in the temple of justice. * * * He violates his oath of office when he resorts to deception, or permits his clients to do so. He is under no obligations to seek to obtain, for those whom he represents, that which is forbidden by the law. If he suffers false and perjured testimony to be presented to the presiding judge, with the possible result of inducing the *268 latter to take jurisdiction of a cause, in whick ■ there would otherwise be no power to act, and to grant a judgment or decree which the law would prohibit if the real character of the offered testimony were known, he can not shield himself behind his supposed obligations to his client.” (P. 574.)
In that case the attorney represented a woman, who was a resident of Canada, in the circuit court of Cook county, Illinois. The grounds upon which she sought a divorce were adultery and cruelty. The cruelty, if any, occurred in Canada. By the laws of Illinois cruelty in Canada would be unavailing in that state. The client was a witness in her own behalf. She testified that she had lived a year in Cook county. This was false. In his answer in the disbarment proceedings he admitted that she testified in his presence to her residence in Chicago crncl that he Imeiv it was false but he was surprised thereby but being “called upon suddenly to determine whether to allow to pass a statement made by his client, for which he was in nowise responsible, which was untrue in fact, but was at the time by him deemed to be immaterial, or to then and there correct such statement, with the possibility that he would thereby discredit his client before the court, and possibly prejudice her case, he permitted the evidence to pass without question or correction, feeling that the responsibility therefor could in no wise be charged against him.”
Commenting upon this .statement the supreme court said: “According to this explanation, there was a conflict in his mind between his sense of duty to the court and his sense of duty to his client. Being in doubt whether to call the attention of the court to the false testimony, or to let it pass in silence, he finally chose the latter course. "Whether or not silence was justifiable under these circumstances, it is not necessary to inquire. It is sufficient to say, that the respon *269 dent was not content with silence. After Ms client’s falsehood was tittered, he sought to make use of it. He continued to press upon the attention of the court the question of the defendant’s alleged cruelty, knowing that proof of cruelty would he immaterial without the false statement as to residence to rest upon. '* * * Respondent knew •that the evidence thus called out was of cruelty that had taken place in Canada, and yet just a moment before he had heard the witness falsely swear to a year’s residence in Illinois, without which residence the cruelty in Canada would be unavailing.” The counsel then drew up a decree in which was a finding that the defendant had been guilty of cruelty. Says the opinion: “The conclusion is abundantly established, that he intended to deceive and attempted to deceive the court by testimony of his client as to a residence in Illinois which he knew to be false.” The court struck his name from its roll and disbarred him.
In In re Henderson, 88 Tenn. 531, an attorney was disbarred for obtaining a decree to remove incumbrances by offering in evidence a mutilated copy of another decree, a true copy of which would have disclosed a valid incumbrance. Said the court: “The mutilated extract supports the theory and allegations of the bill. The decree in its integrity overthrows them. As intimated by Judge Baxter, the question was one for the courts. No court can construe any decree by a detached part of it upon a given subject-matter. Mr. Henderson must have contemplated and passed upon the effect of the whole and the effect of a part, and concluded to pursue the policy of mutilation. * * * It is impossible for us to believe that these important omissions were innocently made with no purpose to deceive or mislead, especially when we remember no party was before the court who had any interest in keeping the lien alive, but, on the contrary, with one *270 indifferent and the other interested in vacating it. The facts make the purpose too plain and palpable to allow us to entertain a doubt of its bad faith. The conclusion is painful but imperative. Too much is staked upon the honesty and good conduct of lawyers for courts to wink at flagrant misconduct. They are trusted by the community with the care of their lives, liberty, and property, with no other security than personal honor and integrity.”
The statute of Westminster first, 3 Ed. I. chap. 29, which was before there was any recognized class of practitioners as attorneys, provided “that if any sergeant, counter, or other, do any manner of deceit or collusion in the king's court, or consent unto it, to deceive or entrap the court or one of the parties, he shall be no more heard in the court to plead for any one,” and this statute Lord Coke declared was but in affirmance of the common law.
In Dickens case, 67 Pa. St. 169, an attorney was disbarred for conspiring to get an opposing attorney drunk in order to get an advantage in a trial about to come on. The opinion was by Judge Ag-new in his usual forcible style.
In Rice v. Commonwealth, 18 B. Mon. 472, an attorney added the word “Prest.” to a copy of a letter. ’“The evident design of the alteration,” says the supreme court, “was to impart to the letter an official character, by making it appear that the author thereof, when he wrote it, was acting in his official capacity of president of the Kentucky Trust Company Bank. The copy of the letter in which this alteration was made had been procured for the purpose of using it, on the trial of a suit then, pending' ’* * *, in which the appellant was acting as connsel for the defendants. The appellant insists that he did not intend to use the copy as evidence on the trial, and that it was offered by another *271 lawyer who was also acting as counsel on the same side, without his knowledge or assent. It appears, however, * * '* that he brought the copy into court, toas present token it toas offered by the other counsel, and made no objection to its use, but on the contrary insisted that it was a correct copy.” The supreme court held he was properly disbarred.
To the honor of the courts and the bar the cases in which counsel have been disbarred for deceit are not numerous, but they are sufficient to show that wherever the courts have had to deal with such misconduct, they have not hesitated to maintain the dignity ot the profession without permitting sympathy for the offender to control their action. To the cases already noted, may be added: State v. Burr, 19 Neb. 593; People ex rel. v. Goodrich, 79 Ill. 148; Ex parte Cole, 1 McCrary, 405; Davis v. State, 92 Tenn. 634; Baker v. State ex rel. 15 S. E. Rep. 788; In re Serfass, 8 Cent. Rep. 850, 116 Pa. St. 455; Ex parte Brown, 1 How. (Miss.) 303.
In this case the distinction is sought to be made between the culpability of the original mutilators of the official stenographic transcript of the evidence and the subsequent adoption of the emasculated bill of exceptions by respondent for the purpose of his argument in this court. I am unable to draw the distinction either in law or ethics.
In my opinion when Major Mullins discovered that the record was not the truth which it purported to be, two courses lay before him. His obligation to this court, at whose bar he had so long practiced and achieved so many honorable triumphs, demanded that he should repudiate the fraud and if need be abandon a cause which could only be won by falsehood and deceit. On the other hand, knowing the fraud, if he chose to avail himself of it, he is now estopped from *272 denying any responsibility therefor. His attempt to avail himself of the fraud and yet escape all the consequences should not be tolerated.
It is a gross misconception of the lawyer’s duty to suppose that he owes no fidelity to any one save his client, and that the latter is the keeper of his conscience. He is expressly bound by his oath to faithfully demean himself as an attorney with all due fidelity to the court of which he is an officer. When once convinced that he can not serve his client without aiding him to consummate a fraud upon the court and his adversary, and that in the further prosecution of his cause he must rely upon false evidence or fraudulent record, his plain duty is to abandon the cause. There is not one rule of morals for the advocate and another for the client. Neither is, or can be, justified by any sound code of ethics in knowingly practicing or acquiescing in falsehood or in attempting to deceive a court by false evidence. A prime duty of every lawyer is to maintain the respect due to the courts of justice and judicial officers and to employ in the maintenance of any cause committed to his charge only honorable means, and never to mislead a court by artifice or false statement of fact.
Painful as this duty is, it seems to me there can be but one conclusion, and that is that respondent has forfeited his right to have his name continued on the roll of attorneys of this court. I regard the fraudulent ■ practices resorted to in the Rowell case as the most flagrant that have ever come before the bar and the courts of this state. It was a deliberate effort to discharge a prisoner who had been twice convicted of murder in the first degree of a helpless woman and four children, and to which was superadded the burning of their bodies, by imposing upon this court a false statement of the evidence and of the cross-examination *273 of the defendant in the circuit court. If this conduct can he condoned, I confess myself at a loss to conceive-of conduct which will prove sufficiently unprofessional to deserve disbarment.
Brace, O. J., and Sherwood, J., concur in my views.